UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

MAXWELL ROULEAU,

    Plaintiff,

      v.                                          Civil Action No.

MAINE SCHOOL SOLUTIONS, LLC
and BECKET ACADEMY, INC.

    Defendants.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Maxwell Rouleau ("Mr. Rouleau"), by and through

undersigned counsel, and complains against the Defendants, Maine School Solutions, LLC and

Becket Academy, Inc., as follows:

JURISDICTION AND PARTIES

1.      This action arises under the Maine Whistleblowers' Protection Act ("MWPA"), 26

M.R.S. §§831 *et seq.*, as enforced through the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§

4551 *et seq.*; and the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*

2.      Mr. Rouleau is a United States citizen residing in the Town of Belgrade, County of

Kennebec, State of Maine.

3.      Maine School Solutions, LLC ("MSS") provides Special Education Services to

students with social, emotional, behavioral, and developmental needs in Central Maine.

4.      MSS owns and operates three Special Purpose Private Schools. Mr. Rouleau

worked at their Central Maine Learning Center location in Belgrade, Maine.

5.      Becket Academy, LLC ("Becket") is a nonprofit organization that provides individual and family therapy, targeted case management, mentoring, home-based treatment, and residential care.

6.      At times material to this Complaint, MSS was owned and operated by Becket.

7.      At all times material to this matter, the two Defendants were an integrated enterprise with common ownership, common management, interrelated operations, and integrated resources.

8.      Evidence of the integrated nature of the Defendants includes the following.

9.      Defendants represented to Defendants' workers compensation insurance carrier that Mr. Rouleau's employer was Becket.

10.     Mr. Rouleau's employer-sponsored health insurance listed his employer as Becket.

11.     Becket's 990 form reflects that MSS is a "disregarded entity" and that Becket is the "direct controlling entity".

12.     A 990 form for Becket filed on March 20, 2024 sets out in Part VII Section A, with regard to Becket Academy's "Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees" that Brad Ulmer was the Vice President of Becket Academy.

13.     A 990 form for Becket filed on May 11, 2024 sets out in Part VII Section A, with regard to Becket's "Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees" that Mr. Ulmer was the CEO of MSS. The form reflects that MSS's CEO was a Becket employee.

14.     Defendants had 500 or more employees during 2023 and 2024.

15.     MSS had 200 or more employees during 2023 and 2024.

16.     This Court has subject matter jurisdiction over Mr. Rouleau's federal and state claims pursuant to 28 U.S.C. §§ 1331 and 1367.

17.     On or about March 7, 2025, Mr. Rouleau filed a timely Complaint/Charge of Discrimination against Defendants alleging unlawful retaliation and whistleblower retaliation with the Maine Human Rights Commission ("MHRC").

18.     On or about November 10, 2025, the MHRC issued Notices of Right to Sue with respect to Mr. Rouleau's state law claims.

19.     Mr. Rouleau has exhausted his administrative remedies with respect to all claims set forth in this Complaint requiring administrative exhaustion.

<u>JURY TRIAL REQUESTED</u>

20.     Mr. Rouleau requests a trial by jury for all claims and issues for which a jury is permitted.

<u>FACTUAL ALLEGATIONS</u>

21.     Mr. Rouleau was hired by Defendants on September 25, 2023 and worked there until his termination on November 26, 2024.

22.     Most recently, Mr. Rouleau worked for Defendants as a Behavioral Health Professional and earned $23 per hour

23.     Mr. Rouleau performed his job in a satisfactory manner during the 14 plus months of his employment.

24.     Jacob Bearce was Mr. Rouleau's direct supervisor.

25.     Brad Ulmer is the President/CEO of MSS.

26.     Scott Proctor is the Principal and Executive Director of MSS.

27.     Brad Pierce is the Technology Coordinator and Facilities Director at MSS. He is responsible for MSS's online billing platform, ExtendedReach.

28.     Taylor Williams is a Behavioral Health Professional Coordinator at MSS. He was one of Mr. Rouleau's supervisors and then became the Assistant Program Coordinator.

29.     Christina Ashe is a Licensed Social Worker who works as an Out of Home Investigator for the Department of Health and Human Services ("DHHS"). She was investigating reports of abuse at MSS/Becket during Mr. Rouleau's employment.

30.     Sarah Ferguson is an Education Specialist in the Maine Department of Education's ("DOE") Office of Special Services and Inclusive Education. She was investigating reports of abuse and fraud at MSS/Becket during Mr. Rouleau's employment.

31.     Mr. Ulmer became a member/owner of MSS in October 2024.

32.     As set out in detail below, Mr. Ulmer had management responsibilities for MSS during the period relevant to this case; Mr. Rouleau made protected reports to Ulmer; and the evidence reflects that Ulmer became angry in connection with a DHHS investigation, asked the DHHS investigator which employee had made the protected reports; and upon information and belief Ulmer was a decision-maker with regard to Mr. Rouleau's retaliatory termination.

33.     In November 2023, Mr. Rouleau reported to Mr. Bearce that he suspected a student was experiencing abuse at home. The student had informed Mr. Rouleau that his father was beating him.

34.     Mr. Bearce told Mr. Rouleau to go speak with a clinician (social worker) and that Mr. Rouleau's duty as a mandated reporter ended after he spoke with a clinician.

35.     The clinician, Josh Turner, informed Mr. Rouleau that DHHS was "backed up" and a report wouldn't help because it was likely that the student was already in their system.

36.    Mr. Rouleau followed up about this suspected abuse every couple of months, and each month he was simply told to speak to the clinicians.

37.    Upon information and belief, nothing was done to follow up on Mr. Rouleau's allegation of abuse.

38.    In October or November 2024, Mr. Rouleau was informed by Christina Ashe, a DHHS employee, that DHHS had never received an abuse allegation from MSS or Becket with regard to the student in question.

39.    Mr. Rouleau had been put in contact with Ms. Ashe after he made a report to Sarah Ferguson at the DOE about the illegal activities he witnessed at MSS/Becket and was actively communicating with her throughout her investigation of the school (as described below).

40.    It was Mr. Rouleau's understanding that MSS and Becket had a duty under the mandated reporter laws to report suspected abuse to the State of Maine.

41.    22 M.R.S.A. §4011-A (1) states that whenever a mandated reporter (such as Mr. Rouleau) is required to make a report, they shall notify either the person in charge of the institution, agency, or facility or a designated agent who shall then cause a report to be made. This statute also states that an employer may not take any action to prevent or discourage an employee from making a report.

42.    Throughout Mr. Rouleau's employment, he witnessed many students being restrained by employees and being placed in seclusion.

43.    Mr. Rouleau estimates that he witnessed an average of 5 restraints per week.

44.    Maine law require that MSS and Becket conduct restraint trainings each month. 20-A M.R.S.A. § 4014; 05-071 C.M.R. ch. 33, § 9 (Dept. of Educ. 2012).

45.     Throughout the entirety of his employment, Mr. Rouleau only participated in three restraint trainings held by Defendants. Mr. Rouleau participated in; 1) an afternoon workshop training in 2023 which was supposed to be a refresher course for employees who were certified (Mr. Rouleau was not yet certified); 2) a certification training in February 2024; and 3) a training that lasted approximately 30 minutes in October 2024.  Defendants did not hold monthly trainings and did not do trainings with all staff at the same time.

46.     After a visit from DHHS and the DOE in December 2024, Behavioral Health Professionals were instructed to go "hands off" with students and not initiate any more restraints.

47.     Upon information and belief, this is because investigators confirmed inappropriate use of physical restraints at MSS/Becket.

48.     Maine statute and regulations required that MSS and Becket hold a debriefing after each instance of restraint or seclusion.

49.     Throughout Mr. Rouleau's entire employment at MSS/Becket, he only witnessed 3 debriefings after a restraint or seclusion. These three debriefings occurred after Mr. Rouleau complained to Devin Gilman, the Special Education Director, in August 2024 that he believed it was illegal not to hold a debriefing after restraining a student.

50.     Following Mr. Rouleau's report some debriefings occurred but then the practice ended.

51.     20-A M.R.S.A. §4014 (5) authorizes the Maine Department of Education to issue rules governing seclusion and restraint in an educational setting.

52.     The Maine Department of Education has issued rules governing seclusion and restraint which are set out in 05-071-Chapter 33 ("Chapter 33").

53.     Chapter 33, section 9 requires that after each incident involving the use of physical restraint or seclusion, the covered entity must ensure that, within two school days, an administrator or designee reviews the incident with all staff who implemented the restraint or seclusion and with the student who was restrained. Staff must also develop and implement and/or revise a written plan for response and de-escalation for the student.

54.     In February 2024, Mr. Rouleau was assigned to work with a student ("Student 1")[1]  placed in 1:1 isolation.

55.     Student 1's Individualized Education Program (IEP) had not been changed to reflect his isolation.

56.     Mr. Rouleau was concerned that Student 1's IEP was not being followed, which he knew to be illegal, and relayed his concerns to his supervisors.

57.     While Mr. Rouleau was working with Student 1, he was instructed to highlight the answers to his work and permit the student to copy them. Mr. Rouleau did not think that this was in the student's best interest and informed his supervisors of this belief.

58.     Mr. Rouleau frequently witnessed other staff members assigned to Student 1 permit him to sit on his phone for the entirety of his educational time. This was in violation of his IEP and was not in his best interest.

59.     Mr. Rouleau reported this to administration, including Mr. Proctor.

60.     On March 12, 2024, Mr. Rouleau gathered work for Student 1 to complete while he was in isolation. Mr. Rouleau went to each of his teachers to collect his work.

61.     When Mr. Rouleau arrived in the history teacher's classroom, the teacher made up Student 1's assignment on the spot.

---

[1] Student's name redacted for privacy reasons.

62.    Mr. Rouleau knew that the Special Education Director typically oversaw and helped create Student 1's assignments.

63.    When Mr. Rouleau tried to complete this assignment with Student 1, it became clear that this was above his ability level. The student was not able to read, but had been given a worksheet that required critical thinking about the Constitution.

64.    Mr. Rouleau went to his supervisors and explained that Student 1 did not have the correct tools or knowledge with which to complete an assignment at this skill level.

65.    Mr. Rouleau explained to his supervisors that this assignment was above Student 1's education and comprehension level. The full comment was "Giving this student work that is well above his education level would be the equivalent of me bringing in a calculus textbook and trying to teach the staff how to solve integrals. Without the base knowledge, your brain can't comprehend it".

66.    Later on March 12, 2024, Mr. Rouleau was told that he should not have questioned the work that had been assigned to Student 1.

67.    Mr. Rouleau was informed that the special education director had selected the work that had been assigned to Student 1 the previous day.

68.    Mr. Rouleau knew this to be untrue because he had gathered the work himself and watched the history teacher print it off after expressing that they had not yet received curriculum from the special education director.

69.    Mr. Rouleau was then told that he would no longer be working with Student 1.

70.    Each comment that Mr. Rouleau had made about Student 1 was because Mr. Rouleau was concerned for the student and was looking out for their best interests.

71.     On March 14, 2024, Mr. Rouleau was called into a meeting with Mr. Williams and Mr. Bearce and directed to sign a supervision that he believed contained inaccurate and retaliatory comments.

72.     This supervision characterized Mr. Rouleau as difficult and standoffish.

73.     Mr. Rouleau told Mr. Williams and Mr. Bearce that he did not agree with this supervision and found it retaliatory, but they refused to listen.

74.     Mr. Rouleau tried to explain to Mr. Williams and Mr. Bearce that he was still processing the information that had been shared with him the day prior, but the supervisors did not take this into account.

75.     The disciplinary write-up that Mr. Rouleau received was unlawful retaliation and was in violation of the MWPA.

76.     This write-up was a proximate and 'but for' cause of Mr. Rouleau's termination.

77.     Mr. Rouleau himself experienced physical abuse as a child. Witnessing unlawful and abusive restraints was very difficult for Mr. Rouleau because of his personal background.

78.     Mr. Rouleau struggled with Defendants' frequent violations of the law. When Defendants failed to handle restraints appropriately, did not offer trainings, and did not conduct debriefs, Mr. Rouleau became very upset and had difficulty dealing with the situation. Mr. Rouleau experienced significant emotional distress as a result of Defendants' actions.

79.     The March 2024 write up and related actions by Defendants would dissuade a reasonable worker from engaging in protected activity and, as set out below, did dissuade Mr. Rouleau from engaging in protected activity for a time.

80.     The March 2024 write up and related actions constituted unlawful retaliation.

81.     Later in the evening of March 14, 2024, Mr. Rouleau texted Mr. Ulmer and informed him that he felt that he was being retaliated against by his supervisors. Mr. Rouleau told Mr. Ulmer that he felt pressured to sign a supervision agreement that would limit his ability to report concerns and that he felt that he was being punished for engaging in student advocacy.

82.     Mr. Rouleau expressed to Mr. Ulmer that he felt as though he was being retaliated against for opposing violations of the law and advocating for the safe and lawful treatment of his students, and that he was afraid to escalate his concerns due to the intimidation and retaliation he was feeling.

83.     The negative supervision was given to Mr. Rouleau in retaliation for reporting unsafe behavior and behavior he believed to be illegal.

84.     Mr. Rouleau had pushed back against Student 1 being kept in isolation without having his IEP updated, which Mr. Rouleau believed was against the law, and was reprimanded for doing so.

85.     On March 15, 2024 Mr. Rouleau was called into a meeting with Mr. Proctor, Mr. Bearce, Mr. Williams, and Ms. Johnston. It was apparent that they were upset and angry with him.

86.     Mr. Rouleau was told that he should not have contacted Mr. Ulmer and was reprimanded for doing so.

87.     Mr. Proctor, Mr. Bearce, Mr. Williams, and Ms. Johnston asked Mr. Rouleau what he was seeking.

88.     This meeting was retaliatory in nature and was intended to intimidate Mr. Rouleau and prevent him from making further reports of unlawful behavior.

89.     During the March 15, 2024 meeting, Mr. Rouleau was informed that he would be reassigned to a new "pod" (group of students). He had previously been working with his pod for six months.

90.     On Mr. Rouleau's first day in his new pod, he overhead the homeroom teacher instructing his colleagues not to allow Mr. Rouleau to be in a leadership position.

91.     This reassignment was extremely stressful to Mr. Rouleau. He became fearful that he would be terminated and felt as though he needed to stop reporting unlawful behavior to avoid upsetting anyone.

92.     On March 24, 2024, Mr. Rouleau went out on familial leave after the birth of his daughter.

93.     Throughout his leave, Mr. Rouleau felt haunted by what he had witnessed at MSS/Becket and frequently dissociated from his life.

94.     Upon Mr. Rouleau's return from leave, Mr. Rouleau was afraid to draw attention to himself. He was afraid of risking his career, especially given that he had a new-born child to support.

95.     In October 2024, Mr. Rouleau began having concerns about the way that his time was being billed to MaineCare. He had discovered that between 5 to 25 additional minutes per day were being added to the time sheets he entered into ExtendedReach, Defendants' platform for tracking employee time that is billed to MaineCare.

96.     Mr. Rouleau's billing hours were changed on 9/18/24, 9/23/24, 10/3/24, 10/7/24, and 10/15/24. These alterations of Mr. Rouleau's billable hours seemed random and were not rounded to the nearest billing increment.

97.    MSS and Becket receive funding from MaineCare for time spent with specific students. MSS and Becket bill MaineCare for services provided by MSS and Becket employees.

98.    MaineCare is Maine's Medicaid program and the funding for MaineCare is provided in part by the federal government and in part by the State of Maine.

99.    After speaking with two other employees, Mr. Rouleau realized that someone was changing billing hours daily so that additional time was billed for the employee responsible for the students from Skowhegan (who arrived later and left earlier than other students).

100.    On October 19, 2024, Mr. Rouleau contacted Mr. Ulmer about his concerns about billing fraud.

101.    On October 21, 2024, Mr. Rouleau was called into a meeting with Mr. Proctor and Mr. Bearce, who informed him that they would take care of the billing situation.

102.    Although Defendants assured Mr. Rouleau that they would address his concerns, they did not take any action until Mr. Rouleau himself attempted to investigate the situation. Even then, the action that they took was incomplete and did not fully address the issue.

103.    After this meeting, Mr. Rouleau contacted ExtendedReach to request an audit of his login history. ExtendedReach informed Mr. Rouleau that he needed administrator permission to receive this information.

104.    Mr. Rouleau requested permission from Mr. Bearce, Mr. Proctor, and Mr. Pierce to access his login history on ExtendedReach.

105.    On October 22, 2024, Mr. Rouleau was called into a meeting with Katelynn Fitzgerald, a Human Resources representative, and Ashley King, a billing representative. He

was informed that they had been assigned to gather information about his concerns with MSS and Becket.

106.    Mr. Rouleau's main concerns reported during this meeting were as follows.

107.    His billable hours were being adjusted so that they did not accurately reflect his time. In particular, MaineCare was being billed for time when Mr. Rouleau's students were not receiving services.

108.    Mr. Rouleau reported that he believed that this was defrauding the MaineCare system.

109.    Defendants failed to complete debriefings after performing physical restraints or seclusions. Mr. Rouleau reported that he believed this to be a violation of Maine statute and regulations.

110.    Mr. Rouleau explained during the meeting that he had reported suspected abuse to his direct supervisor, Mr. Bearce, and had been told that his duty as a mandated reporter ended when he informed clinicians of his suspicions. Mr. Rouleau did not believe that the suspected abuse had been properly investigated.

111.    Mr. Rouleau reported his concern that he would be retaliated against by supervisors for reporting these issues.

112.    During his October 22, 2024 meeting with Ms. Fitzgerald and Ms. King, Mr. Rouleau noticed that Ms. Fitzgerald wrote notes about his concerns on billing issues and debriefings after physical restraints.

113.    When Mr. Rouleau expressed concerns that he would be retaliated against by supervisors for making reports, Ms. Fitzgerald stopped taking notes and seemed disengaged.

114.    On October 30, 2024, Mr. Rouleau was called into a meeting with Ms. Fitzgerald and Mr. Proctor and informed that the changes he had noticed in his time sheet were "rounding errors", though they did not explain to Mr. Rouleau how these errors had occurred.

115.    Mr. Rouleau followed all applicable guidelines about billing standards and was painstakingly accurate with his notes and billing.

116.    Defendants made no guarantees to Mr. Rouleau that his notes and time sheets would not be edited moving forward.

117.    As discussed above, despite Mr. Rouleau's internal reports to his employer regarding these issues, it did not appear that they took any steps to address them.

118.    Mr. Rouleau noticed that his time sheet was only changed for one of his students, but that the time sheets for his other students remained unchanged.

119.    Mr. Rouleau did not believe that these changes were being made due to an error on his part because if he had been making an error, his time sheets for each student would need to be changed.

120.    Mr. Rouleau's reports regarding the increases to his hours were reasonable and were made in good faith.

121.    Upon information and belief, one of Mr. Rouleau's coworkers made a report of suspected abuse by Defendants to the DOE in August 2024.

122.    In October 2024, Mr. Rouleau noticed a marked increase in restraints that were not debriefed. In the span of four days, Mr. Rouleau was involved in nine physical restraints.

123.    On October 24, 2024, DOE investigators were scheduled to come to MSS/Becket.  During this visit, investigators went to each classroom including  the classroom in which Mr. Rouleau was working.

124.    For the entirety of the investigators' visit to the classroom Mr. Rouleau was assigned to, Mr. Proctor was in the adjoining room. During a subsequent phone call with Sarah Ferguson from the DOE as referenced below, Mr. Rouleau asked if Mr. Proctor had been present during any of the other classroom visits and she told Mr. Rouleau that he had not.

125.    Mr. Rouleau did not feel comfortable speaking to the investigators with Mr. Proctor present because he feared retaliation.

126.    Mr. Rouleau was given the investigator's phone number by the coworker who made the original call to the DOE. The coworker indicated that they were asked by the DOE investigator, Ms. Ferguson to share her number with other employees who may have things to report. Because Mr. Rouleau had not had the chance to speak with the DOE investigator when they visited MSS/Becket, he decided to contact the DOE to share his concerns because they had not been addressed by his employer.

127.    On October 26, 2024, Mr. Rouleau emailed Sarah Ferguson, DOE investigator, to share his concerns. The concerns he shared with her are as follows.

128.    Defendants had revoked staff access to the online platform for viewing and editing incident reports and treatment plans.

129.    In August, a staff member informed a student that if they did not stand up within one minute, the chair would be pulled out from under them. The student failed to stand up and the staff member pulled the chair out from under them, causing the student to fall face-first into the table. Administration requested that the employee writing this incident report omit the portion of the report detailing the staff member's actions and, when the employee refused, later edited the report without the employee's knowledge.

130.    Defendants' employees had failed to follow compliance protocols when administering state-mandated testing to students.

131.    Two students had been placed in 1:1 seclusion settings for multiple months at a time.

132.    Defendants' employees did not conduct debriefings after every physical restraint or seclusion, as is required by law.

133.    Mr. Rouleau's reports to Ms. Ferguson constitute protected reports for purposes of the MWPA and FCA.

134.    Mr. Rouleau reported these things to shed light on them and in hopes that reporting would result in the issues being addressed and eliminated going forward.

135.    On November 19, 2024, Mr. Rouleau received an email from a DHHS investigator, Christina Ashe, informing him that she had received his contact information from her contact at the DOE (Ms. Ferguson).

136.    Ms. Ashe asked to speak with Mr. Rouleau about his experience working for Respondent.

137.    Ms. Ashe and Mr. Rouleau met via Zoom on November 20, 2024.

138.    During this meeting, Mr. Rouleau shared with Ms. Ashe the concerns he had previously shared with Ms. Ferguson. Mr. Rouleau also brought up concerns that Defendants were fraudulently billing MaineCare for his time.

139.    Mr. Rouleau's reports to Ms. Ashe constitute protected reports for purposes of the MWPA and FCA.

140.    Mr. Rouleau reported these things to shed light on them and in hopes that reporting would result in the issues being addressed and eliminated going forward.

141.     On November 22, 2024, Ms. Ashe emailed Mr. Rouleau a follow up question about the MaineCare fraud he had alleged. Mr. Rouleau provided her with detailed information about his concerns.

142.     Mr. Rouleau's follow up reporting to Ms. Ashe constitutes protected reports for purposes of the MWPA and FCA.

143.     On November 25, 2025, Mr. Rouleau was called into a meeting with Ms. Ferguson and Ms. Ashe. They met in the school conference room and were interrupted by Mr. Proctor during their meeting.

144.     On November 26, 2024, Mr. Rouleau was terminated.

145.     The day that he was terminated, Mr. Rouleau emailed Ms. Ashe to inform her of his termination as Ms. Ashe had asked Mr. Rouleau to keep her appraised of his employment status because she knew that he feared retaliation from Respondent.

146.     On December 4, 2024, Mr. Rouleau received a phone call from Ms. Fitzgerald informing him that the reason for his termination was that his automatic signature on Defendants' billing website had been filled in as a black box instead of his actual signature.

147.     During this December 4, 2024 phone call, after his termination, Mr. Rouleau learned for the first time that the automatic signature on Defendant's billing website was reflected as a black box.

148.     During Mr. Rouleau's phone call with Ms. Fitzgerald, he asked for a written copy of the reason for his termination.

149.     The stated reason for Mr. Rouleau's termination is false and reflects an effort to dissemble the evidence of the true, retaliatory motives for his termination. The stated reason is false for the following reasons.

150.    Prior to May 29, 2024, when all employees received an email from Taylor Williams directing them to enter automatic signatures into the online billing platform, Mr. Rouleau had never signed any of his notes. After receiving the email on May 29, 2024, Mr. Rouleau completed the automatic signature as requested on the billing platform.

151.    Defendants clearly had a way to bill for Mr. Rouleau's time without his signature, given that he had not signed any notes during his first 8 months of employment.

152.    Regardless, Mr. Rouleau entered his automatic signature into the online platform as directed. Mr. Rouleau believed that he had completed the task successfully.

153.    When Mr. Rouleau discovered that his employer was billing Mainecare for services provided when students were not on campus, and had reason to believe that his employer was attempting to defraud the government by doing this, he attempted to remove his automatic signature from the online platform so that his signature would not be used in connection with inaccurate and fraudulent billing and instead would manually enter his signature whenever it was required after reviewing the document in question for accuracy. Mr. Rouleau did not want the person who was changing his billable hours to have access to his signature without his knowledge.

154.    When Mr. Rouleau attempted to remove his signature, he discovered that there was not an option to do so. He clicked on the signature box to see if another option would appear on the screen, then hit the back button on the webpage so that the system would not save any changes he had made in his attempt to remove his automatic signature.

155.    Mr. Rouleau believed that his previously entered automatic signature would still be uploaded onto the webpage.

156.    During the training that Mr. Rouleau received from Defendants regarding Data Assessment Plan ("DAP") Notes, he was not informed that he needed to sign the notes he created.

157.    Notably, Defendants did not interview Mr. Rouleau or otherwise investigate this issue or his motives before terminating his employment. Rather, they falsely claimed that he had knowingly and intentionally made his signature a black box to avoid any billing relating to his time without any knowledge or evidence of bad faith on the part of Mr. Rouleau.

158.    Defendants' stated reason for Mr. Rouleau's termination is pretextual and is meant to cover up the true, retaliatory motives for his termination.

159.    Ms. Ashe had asked Mr. Rouleau to inform her of his reason for termination once one was provided to him.

160.    On December 4, 2024, Mr. Rouleau told Ms. Ashe what Defendants had told him about his termination.

161.    On December 4, 2024, Ms. Ashe emailed to inform Mr. Rouleau that in November 2024, prior to his termination and after he had reported his concerns to Ms. Ashe and after Ms. Ashe had brought the concerns to Defendants, that the Defendants' administrators were trying to figure out who made the report about abuse.

162.    Ms. Ashe told Mr. Rouleau that administrators had said they wanted to terminate the employee who made the report and that they had also stated that they knew which employee it was. An excerpt of her email is below:

> "I will add that administrators were trying to figure out who made the report on the initial day of response. They stated that there was an employee that was disgruntled because he "wasn't moving up fast enough" in the company and was saying things that were not true. They stated, we would terminate but would get hit with a retaliation lawsuit. I never told them who made the report but during their interview, they were actively trying to determine who had made the report.

At one point, an administrator came back into the room and said, we know who made the report because there is only one person that has had an issue with "debriefing" and they stated, I know you have been asking people about debriefing. I explained to that person that it wasn't about who made the report because the information that was provided was accurate. I told them that we had been asking every employee about the use of the QR and that debriefing was part of that conversation.  They stated that there is only one employee that has recently brought up debriefing."

163.    On February 10, 2025, Mr. Rouleau asked Ms. Ashe which administrator had made the retaliatory comments and she informed him that it had been Mr. Ulmer who made the comment about wanting to terminate the employee who had made the report.

164.    Ms. Ashe's information establishes that Mr. Ulmer was angry at Mr. Rouleau for making protected reports and openly discussed his retaliatory animus and his desire to terminate Mr. Rouleau because of his protected reports.

165.    On December 11, 2024, Ms. Fitzgerald sent Mr. Rouleau the written reason for his termination. This letter included various allegations of performance and behavioral issues that had not been addressed with Mr. Rouleau previously and that were inaccurately characterized as performance issues.

166.    The majority of the alleged instances of behavioral and performance issues had occurred more than six months prior to Mr. Rouleau's termination.

167.    As referenced above, these alleged reasons for termination were not mentioned at the time of Mr. Rouleau's termination.

168.    At the time of his termination, the only stated reason for termination was "Effective immediately, your employment at MSS has been terminated. This is a companywide decision. If you have any questions you can email HR".

169.    The fact that Defendants added new and different rationales to support Mr. Rouleau's termination is strong evidence that Defendants' stated reasons for termination are pretextual.

170.    Furthermore, the allegations of performance and behavioral issues were not accurate. As discussed above, these alleged behavioral and performance issues, and the subsequent negative supervisory report that Mr. Rouleau received, were retaliatory in nature.

171.    In the written reason for Mr. Rouleau's termination, Defendants explicitly reference the March 2024 write-up and 'previous supervisions' as the reason for Mr. Rouleau's termination.

172.    The March 2024 write-up was a factor in the decision to terminate Mr. Rouleau.

173.    MSS and Becket were an integrated enterprise at the time of the March 2024 write up and are each liable for this retaliatory write up.

174.    When Mr. Rouleau was first hired, Mr. Bearce informed him that they needed to give him low scores for his first couple performance reviews so that he would "have things to work on" throughout his employment.

175.    Mr. Bearce told Mr. Rouleau that Mr. Ulmer had done the same thing to him when he first started working at MSS/Becket.

176.    On August 7, 2024, 3 months before his termination, Mr. Rouleau received a positive evaluation that stated that he had made improvements in his performance and behavior and was meeting Defendants' goals.

177.    Mr. Rouleau received a $1 per hour raise on September 9, 2024, two months before his termination.

178.    Mr. Rouleau received a positive yearly review on October 11, 2024, one month before his termination.

179.    Mr. Rouleau's October 2024 performance evaluation states the following:

- "Max has done well internalizing the student's goals and expectations"
- "Max has established healthy pro-social boundaries with the students he serves"
- "Max has established himself a key staff member in the k-4 pod"
- "Max has found ways to communicates [sic] with staff even in times of stress"
- "Max is always available for the students he serves and provides the proper support"

180.    Most importantly, the October 2024 performance evaluation states "Initially upon Max's start we had communication issues regarding the chain of command. Max has made significant improvements in this area. We do not foresee any further issues in the areas" and "Again, Max has improved significantly regarding communication and professional growth".

181.    Both of these comments directly undercut and disprove Defendants' claims that Mr. Rouleau was insubordinate and a poor performer.

182.    Additionally, on December 19, 2024, the Maine Department of Labor Bureau of Unemployment Compensation ruled that Mr. Rouleau had not been discharged for misconduct.

183.    The chronology of events and timing of Mr. Rouleau's protected reports and termination evidence a causal connection.

184.    Defendants changed their justification for Mr. Rouleau's termination, which evidences pretext.

185.    Mr. Ulmer made statements to the DHHS investigator reflecting that he was angry that Mr. Rouleau had made the protected reports in question, that he wanted to terminate Mr. Rouleau for these reports, and that he understood that such a termination would lead to a retaliation claim.

186.    These comments by Mr. Ulmer constitute admissions and reflect retaliatory animus and motive.

187.    Mr. Rouleau was terminated in retaliation for making reports of unsafe and illegal activity, which violated the MWPA as enforced through the MHRA.

188.    Mr. Rouleau's reports are also protected activity under Federal False Claims Act and his termination constitutes FCA retaliation.

189.    Mr. Rouleau has engaged in a comprehensive, documented work search since his termination but has been unable to secure comparable employment.

190.    The process of applying for and being rejected for positions has been extremely difficult and stressful.

191.    Where Defendants have falsely characterized that Mr. Rouleau was terminated for performance issues/insubordination he is likely precluded from securing other positions in the field.

192.    Mr. Rouleau found his job working with kids with disabilities to be extremely rewarding and fulfilling and the loss of this career is particularly painful.

193.    The loss of income from the termination has caused Mr. Rouleau substantial stress and anxiety.

194.    Mr. Rouleau has been unable to provide, financially, for his family in the same way he could if he had not been terminated.

195.    The termination has delayed the plan by Mr. Rouleau and his spouse to purchase their own home.

196.    The termination has led Mr. Rouleau and his spouse to cancel medical appointments because they lack insurance and cannot afford to pay for the treatment.

197.    The experience of being retaliated against for reporting and opposing unlawful and unsafe practices in the workplace has been extremely upsetting for Mr. Rouleau.

<u>COUNT I: MWPA/MHRA Retaliation</u>

198.    Paragraphs 1 – 197 are incorporated by reference.

199.    The MHRA makes it unlawful for an employer to discharge an employee or discriminate with respect to hire, tenure, promotion, transfer, compensation, terms, conditions or privileges of employment or any other matter directly or indirectly related to employment because of previous actions that are protected under the WPA.

200.    The WPA makes it unlawful for an employer to discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee, acting in good faith, reports orally or in writing to the employer or a public body (a) what the employee has reasonable cause to believe is a violation of a law or rule adopted under the laws of Maine or the United States, or (b) what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of any individual or (c) what the employee has reasonable cause to believe is a deviation from the applicable standard of patient care.

201.    Mr. Rouleau's reports to his employer, to the DOE investigator and the DHHS investigator constituted protected activity for purposes of the MWPA.

202.    These reports were made in good faith because Mr. Rouleau believed Defendants' actions to be illegal and unsafe and wished to take action to protect the vulnerable population with which he worked.

203.    Furthermore, the issues that Mr. Rouleau reported to his employer and to the DOE and DHHS were violations of the law.

204.    While a Plaintiff asserting whistleblower retaliation need only show that they had a good faith, reasonable belief that the things they reported were illegal, the evidence reflects that the things that Mr. Rouleau reported were illegal.

205.    Mr. Rouleau reported his concerns to his employer as set out above before bringing them to the State.

206.    In addition, 26 MRSA §833 (4) explicitly states:

**Reports of suspected abuse.** An employee required to report suspected abuse, neglect or exploitation under Title 22, section 3477 or 4011-A, shall follow the requirements of those sections under those circumstances. No employer may discharge, threaten or otherwise discriminate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee followed the requirements of those sections.

207.    Mr. Rouleau is a mandated reported under 22 MRSA §4011(A) because he is a state employee in his capacity as a Behavioral Health Professional.

208.    Under 22 MRSA §4011(A), Mr. Rouleau is required to immediately report suspected abuse to the Department of Health and Human Services Office of Child and Family Services.

209.    Mr. Rouleau is protected from retaliation under the MWPA for making a mandated report, regardless of whether or not he makes a report to his employer first (although he did make a report to his employer first).

210.    Furthermore, Defendants made clear during the course of Mr. Rouleau's employment that they did not take the laws seriously and were not willing to acknowledge and address violations of law that were reported to them.

211.    While Mr. Rouleau did report his concerns to his employer before bringing them to the State, if he had gone straight to the State that would still be protected where reporting his concerns to his employer would have been futile.

212.    Defendants refused to address the reports made by Mr. Rouleau during his employment.

213.    Defendants issued Mr. Rouleau retaliatory discipline and terminated him in retaliation for his protected reports in violation of the MWPA as enforced through the MHRA.

<u>COUNT II: FCA Retaliation</u>

214.    Paragraphs 1-213 are incorporated by reference.

215.    The anti-retaliation provisions of the FCA make it unlawful to discharge, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of lawful acts done by the employee in an effort to stop a violation of the FCA.

216.    Mr. Rouleau reported to his employer and to the State of Maine that Defendants were billing MaineCare for hours that he had not worked and in this way were defrauding the State of Maine and the federal government by billing for and likely receiving payment for services that were not provided and supporting these claims with false documentation.

217.    Mr. Rouleau's reports that Defendants were billing MaineCare for more hours than he was working were made in an effort to stop Defendants from violating the FCA by defrauding the government.

218.    Mr. Rouleau engaged in protected activity under the FCA when he reported concerns about conditions and practices that could reasonably lead to an FCA action; in other words, investigations, inquiries, testimonies or other activities that concern the employers' knowing submission of false or fraudulent claims for payment to the government and the use of false records material to a fraudulent claim. Mr. Rouleau's actions were done in order to stop violations of the FCA.

219.    Defendants violated the anti-retaliation provision of the FCA when they terminated Mr. Rouleau.

PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A.    Declare the conduct engaged in by Defendants to be in violation of his rights;

B.    Enjoin Defendants, their agents, successors, employees, and those acting in concert with it from continuing to violate his rights;

C.    Order Defendants to reinstate Plaintiff or award front pay to Plaintiff;

D.    Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendants' retaliation;

E.    Award equitable-relief for back pay, benefits and prejudgment interest;

F.    Award compensatory damages in an amount to be determined at trial;

G.    Award punitive damages in an amount to be determined at trial;

H.    Award liquidated damages in an amount to be determined at trial;

I.    Award nominal damages;

J.    Award attorneys' fees, including legal expenses, and costs;

K.    Award prejudgment interest;

L.    Require Defendants to mail a letter to all employees notifying them of the verdict against them and stating that Defendants will not tolerate discrimination in the future;

M.    Require that Defendants post a notice in all of their workplaces of the verdict and a copy of the Court's order for injunctive relief;

N.    Require that Defendants train all management level employees on the protections afforded by the MWPA and the FCA;

O.    Require that Defendants place a document in Plaintiff's personnel file which explains that Defendants unlawfully terminated him because of unlawful discrimination and retaliation; and

P.    Grant to Plaintiff such other and further relief as may be just and proper.

Dated: November 12, 2025

/s/ Chad T. Hansen
Chad T. Hansen
Attorney for the Plaintiff

EMPLOYEE RIGHTS GROUP
92 Exchange Street 2nd floor
Portland, Maine 04101
Tel. (207) 874-0905
Fax (207) 874-0343
Chad@EmployeeRightsLaw.Attorney