**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| MAXWELL ROULEAU,<br><br>*Plaintiff*,<br><br>v.<br><br>MAINE SCHOOL SOLUTIONS, LLC and BECKET ACADEMY, INC.,<br><br>*Defendants*. | Case No. 1:25-cv-00566-LEW |

**MAINE SCHOOL SOLUTIONS, LLC'S OPPOSITION TO ROULEAU'S SPECIAL MOTION TO DISMISS PURSUANT TO MAINE'S UNIFORM PUBLIC EXPRESSION PROTECTION ACT (UPEPA) AND RULE 12(b)(6) MOTION TO DISMISS**

Maine School Solutions, LLC, Defendant and Counter-Plaintiff ("MSS" or "Counter-Plaintiff"), submits this opposition to Counter-Defendant, Maxwell Rouleau's ("Rouleau" or "Counter-Defendant") Special and Rule 12(b)(6) Motion to Dismiss. Rouleau's request to this Court to dismiss MSS's counterclaims must be denied for two separate, independently sufficient reasons. First, Maine's new Uniform Public Expression Protection Act ("UPEPA"), the state-law process is preempted by Federal Rules of Civil Procedure 12 and 56 in ways that the First Circuit in Godin v. Schencks, did not address. 629 F.3d 79, 91 (1st Cir. 2010). Specifically, as applied in this case and consistent with all other courts that have addressed UPEPA on this issue, the process outlined in Maine's UPEPA cannot exist side by side with Rules 12 and 56 because forcing a summary-judgment-type showing without discovery access creates a direct collision with the Federal Rules. Paucek v. Shaulis, 349 F.R.D. 498, 513-14 (D.N.J., May 6, 2025); Peach v. Hagerman, 2024 WL 1748443, at *6 (W.D. Ky. Apr. 23, 2024).

Second, even if UPEPA is not preempted, MSS has provided prima facie evidence on its two counterclaims: defamation and tortious interference. The employee declarations, emails, and

documents provided with this Opposition, paint the distinct picture of an employee who was not engaged in good-faith petitioning, but rather outlandish retaliatory fabrications including that his supervisors instructed him not to respond to children that were harming themselves, and stated to him that they needed to "break [children]," which Rouleau manufactured only after he received legitimate, documented performance feedback. Additionally, well after receiving detailed results of an investigation finding no MaineCare fraud, Rouleau went on to baselessly claim to that MSS was "fraudulently billing MaineCare for his time" in October and November meetings with DHHS and MDOE, (Compl. ¶ 138), an allegation for which he had no information or evidence.

## Factual Background

### 1. MSS and Central Maine Learning Center

MSS is a family of three (3) licensed special purpose private schools, ("SPPS") which are schools "established specifically to serve children with disabilities and/or developmental delays[1], providing special education services to students ranging from kindergarten through twelfth grade in Central Maine. (Ex. 1, Declaration of Brannen McGraw ("McGraw Decl.") ¶ 3.) Through its schools in Belgrade, Monmouth, and Auburn, MSS provides services to students with social, emotional, behavioral, and developmental needs.[2] (McGraw Decl. ¶ 3.) As an SPPS, MSS provides comprehensive, integrated services that address students' behavioral health and special education needs, most often through day treatment programs. (McGraw Decl. ¶ 4.) Students at MSS work

---

[1] 05-071 C.M.R. ch. 101, § III(39) (2026) (Maine Unified Special Education Regulation).

[2] MSS reads Maine's UPEPA law, specifically 14 M.R.S. § 737 (2026), to require it to proffer prima facie evidence "**that could be considered** on a motion for summary judgment under Rule 56 of the Maine Rules of Civil Procedure" and not necessarily following the same the summary judgment process and providing a separate statement of material facts. (Emphasis added.) In reviewing similar filings, this appears to be the approach of courts and parties following the UPEPA process in other states. See, e.g., Claver, et al. v. Rector et al., Docket No. 2:26-cv-00084, ECF No. 44 (W.D. Wash, June 30, 2026); Paucek et al. v. Shaulis, Docket No. 24-9807, ECF No. 50-1 (D.N.J. June 23, 2025). Unlike the Federal Rules, Maine's Rule 56(h) expressly references statements of material fact, and, if this Court seeks such a statement, MSS respectfully requests leave to amend its filings to provide one.

directly with classroom teachers, behavioral health professionals ("BHPs"), clinicians, and various service providers to develop individualized treatment plans consistent with the student's IEP plan. (McGraw Decl. ¶ 5.) Students are referred to MSS schools through the individualized educational program ("IEP") process with their local school districts. (McGraw Decl. ¶ 6.) These providers offer coordinated services depending on a child's needs that include behavioral interventions, clinical therapy, educational instruction, medical care, and social support. (McGraw Decl. ¶ 6.)

Rouleau worked at one of MSS's three schools, Central Maine Learning Center ("CMLC"), an SPPS and day treatment facility located in Belgrade. (McGraw Decl. ¶ 7.) CMLC is well known for its unique applied classes in its agricultural studies program in which students have the opportunity to participate in learning in the school's own farm and greenhouse, raising and caring for animals on the farm, and participating in the building trades program. (McGraw Decl. ¶ 8.) The building trades program also features a state-of-the-art wood shop, and for those students who are able, students participate in daily physical education and art programs. Students also have the opportunity to participate in weekly off-campus field trips and conferences with guest speakers. CMLC currently serves students from over sixteen (16) school districts. (McGraw Decl. ¶ 8.)

**2. Rouleau's Employment**

CMLC hired Rouleau on September 25, 2023, for a position as a behavioral health professional and educational technician ("BHP"). (McGraw Decl. ¶ 7.) Shortly after Rouleau was hired, his supervisors noticed that he was unwilling to follow appropriate chains of command and demonstrated inappropriate and rude behavior. For example, in March 2024, while in the presence of a student with whom he was assigned to work, Rouleau stated that that the student's academic assignment was "too hard" for the student and "his brain [couldn't] comprehend it," and, further, that Rouleau "did not like" working with that particular student. (Ex. 2, Declaration of Jacob

Bearce ("Bearce Decl.") ¶ 4 & Ex. A) Rouleau's managers, BHP Supervisors Jacob Bearce and Taylor Williams, gave Rouleau feedback, explaining that Rouleau's statement was harmful to the student, and that the curriculum decisions are determined by the Director of Special Education in consultation with the student's IEP team. (Bearce Decl. ¶ 4 & Ex. A.)

**3. Some of Rouleau's False Statements**

After receiving this feedback, Rouleau began making numerous complaints, internally, to representatives from the Maine Department of Education ("DOE"), and to the Department of Health and Human Services ("DHHS"). These outlandish "concerns," were provided, for example, in an e-mail in which he indicates that those same supervisors who gave him the negative feedback instructed him to take numerous absurd actions, including that:

- "Jacob Bearce also instructed me to 'let them pass out' on multiple occasions where a student was either choking themselves with a piece of their clothing or hitting their head against the wall in the Quiet Rooms";
- "Taylor Williams stated 'Sometimes you need to break them, you know what I mean?' on approximately 10/7/2024 while I was holding the door of the quiet room with this student during a seclusion"; and
- "They have told us that we are mandated reporters but told us that our duty was only to report suspicions to the student's clinician and explicitly told us not to call DHHS or CPS as we 'don't know the situation as well as the clinicians and CPS might already be involved.' There have been several things that I have taken to clinicians personally and I am unsure if calls were made."

(Exs. B-C to McGraw Decl.)

The statements that Rouleau made to Ms. Ferguson, and later repeated to Christina Ashe, at DHHS during a Zoom meeting on November 20, 2024, (Compl. ¶ 138 [ECF No. 1]), were totally false. At no time did Rouleau's supervisor, Jacob Bearce, instruct him (or anyone else) to leave a student "choking" or otherwise harming themselves, or to "let them pass out." (Bearce Decl. ¶¶ 7-9.) Similarly, at no time did Taylor Williams, Rouleau's other BHP Supervisor, say to Rouleau, "sometimes you need to break them, you know what I mean." (Ex. 3, Declaration of Taylor

Williams ("Williams Decl.") ¶ 5 & Ex. B to McGraw Decl.) MSS has no record of an incident involving Rouleau on October 7, 2024, and while another incident report on a different day that week involved a restraint and seclusion performed by Rouleau, in which Williams supported, he made no such statements. (Williams Decl. ¶¶ 6-7.) Similarly, with respect to Rouleau's allegation that a Clinician instructed him not to make a mandatory report, those statements are also false. (Ex. 4, Declaration of Joshua Turner ("Turner Decl.") ¶¶ 4-10.) Rouleau made similarly false allegations in his Maine Human Rights Commission claim, which were likely repeated in his meetings with DOE and DHHS representatives, that MSS's Clinician, Joshua Taylor, had informed Rouleau "that DHHS was 'backed up' and a report would not help because it was likely that the student was already in their system." (Turner Decl. ¶ 7 & Ex. A.)

In addition to these outlandish assertions, Rouleau has maintained a position that MSS has engaged in fraudulent billing to MaineCare totally without basis. In mid-October 2024, Rouleau contacted the owner, Brad Ulmer, that someone was "billing time for [a] student [that] was not at the school," which prompted a full investigation by MSS's AP/AR and Human Resources Director. (Ex. 4, Declaration of Katelynn Fitzgerald ("Fitzgerald Decl.") ¶¶ 4-5.) Although Rouleau identified what he believed to be approximately one (1) hour of incorrectly billed time in 3-4 weeks, Ms. Fitzgerald and Ms. King did a full review of all time entries for August, September, and October 2024. (Fitzgerald Decl. ¶ 6.) Fitzgerald and King explained that time billed must be in fifteen-minute increments, following the MaineCare rounding rule, and that any times that Rouleau saw changed were as a result of the application of that rule through the school's quality assurance process. (Fitzgerald Decl. ¶¶ 9-11 & Ex. A.) In their internal audit of all billing entries for those three months, the school identified three (3) occasions in which the rule had been applied to alter the times identified in the body of his notes, and of those, only one had required adjustment,

but those were immediately corrected and the state was never billed for those times. (Fitzgerald Decl. ¶¶ 12-14.) During this meeting, Rouleau became visibly upset, demanding that he wanted the person responsible prosecuted for "identity theft," as he called it. (Fitzgerald Decl. ¶ 15.)

After receiving these results, Rouleau then went on to baselessly claim in two separate meetings with DHHS and DOE that "[MSS staff] were fraudulently billing MaineCare for his time." (Compl. ¶ 138.) Although MSS has limited information (i.e., what Rouleau has attached to his agency filings and admitted in his Complaint) regarding the nature and publication of Rouleau's false statements, it strongly suspects that with the benefit of discovery, there will be evidence of many other conversations. Upon information and belief, these outlandish reports were also communicated to parents, some of whom initiated legal action against the school, as the statements the school received from parents seemed to parrot Rouleau's false allegations in material ways. (McGraw Decl. ¶ 18.) Moreover, these "staff reports" to MDOE and DHHS were also sent to *sixteen* school districts that place students at MSS. (McGraw Decl. ¶ 16.) This led the school to have at least one placement declined, citing Rouleau's false concerns, as well as to lose out on potential employees. (McGraw Decl. ¶ 20.)

While these are the starkest examples of blatant falsehoods, Rouleau's "reports" to DOE were much broader. In those, Rouleau complained about school staff not following it's own internal directives for keeping classrooms tidy and cleaning supplies picked up, misconstrued a student's IEP placement for school directives, that incident report forms were not being filled out correctly, and that staff were not being asked to sign an "Assessment Security and Data Privacy Agreement" in administering the Northwest Evaluation Association MAP test, an academic assessment given to students in kindergarten through 12th grade to measure learning progress and achievement, among others. (McGraw Decl. ¶¶ 13-14 & Ex. B.)

## Discussion

**1. The UPEPA process is preempted by Federal Rules of Civil Procedure 12 and 56 as applied in this case.**

Since the enactment of several state statutes targeting "strategic lawsuits against public participation," or anti-SLAPP statutes, numerous courts have addressed the issue of whether the Federal Rules of Civil Procedure preempt the procedures mandated by those state laws, and a circuit split has developed. See, e.g., La Liberte v. Reid, 966 F.3d 79, 86 (2d Cir. 2020) (collecting cases). In Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co., the United States Supreme Court outlined a two-pronged test to determine whether the Federal Rules preempt a state law or rule. 559 U.S. 393, 398 (2010). In its plurality opinion, the Court articulated a "familiar" two-part framework: (1) to determine whether the federal rule answers the question in dispute; and, if it does, (2) the federal rule governs and preempts the state law, "unless it exceeds statutory authorization or Congress's rulemaking power." Id. at 399.

Notably, the Second, Fifth, Tenth, Eleventh, and D.C. Circuits have each held that the anti-SLAPP statutes of various states conflict with the standards dictated by Federal Rules of Civil Procedure 12 and 56. La Liberte v. Reid, 966 F.3d 79, 86-88 (2d Cir. 2020); Klocke v. Watson, 936 F.3d 240, 244-49 (5th Cir. 2019); Carbone v. Cable News Network, Inc., 910 F.3d 1345, 1349-57 (11th Cir. 2018); Los Lobos Renewable Power, LLC v. AmeriCulture, Inc., 885 F.3d 659, 668-73 (10th Cir. 2018); Abbas v. Foreign Pol'y Grp., LLC, 783 F.3d 1328, 1332 (D.C. Cir. 2015). Only the First and Ninth Circuits have held, when analyzing other anti-SLAPP laws, that the Federal Rules and California and Maine's (prior) anti-SLAPP laws can be reconciled, *depending on the facts of the case*. See Godin v. Schencks, 629 F.3d 79, 86-87 (1st Cir. 2010); United States ex rel. Newsham v. Lockheed Missiles & Space Co., 190 F.3d 963 (9th Cir.1999).

In Godin, the U.S. Circuit Court of Appeals for the First Circuit addressed Maine's prior anti-SLAPP law, which required the non-moving party to show that the defendant's statements were "(1) without 'reasonable factual support,' and (2) [] without an 'arguable basis in law.'" Godin, 629 F.3d at 89. In analyzing whether Maine's prior law was preempted, the court looked to the concurring opinion in Shady Grove by Justice Stevens, which asked whether the federal rule was "sufficiently broad" to control the issue of state law, or—stated differently—whether the federal law and rule can be reconciled. Id. at 86-88. Dispositive to Godin's holding was that the prior Maine law and Federal Rules 12 and 56 "are not so broad as to cover the issues within the scope of [Maine's prior anti-SLAPP law]" because, in relevant part, the relevant state law determines the substantive rights, including the allocation of the burden of proof. *Id.* at 88-89. However, as relevant to this case, the Godin court went on to "acknowledge" the "concern about some differences in the mechanics, particularly as to the **record** on which the motion is evaluated." Id. at 89 (emphasis added.) Specifically, the court stated:

> Whether the procedures outlined in Section 556 will in fact depart from those of Rule 12 and Rule 56 **will depend on the particulars in a given case** of the claim and defense. Some Section 556 motions [special motions to dismiss], like Rule 12(b)(6) motions, will be resolved on the pleadings. **In other cases, Section 556 will permit courts to look beyond the pleadings to affidavits and materials of record, as Rule 56 does**. In this way, some Section 556 motions, depending on the particulars of a case, will be resolved just as summary judgment motions under Fed. R. Civ. P. 56 are.

Id. at 90 (emphasis added.)

In Peach v. Hagerman, the court addressed whether a state's adoption of UPEPA is preempted in federal court. Docket No. 4:22-CV-000133-RGJ, 2024 WL 1748443, at *5 (W.D. Ky. Apr. 23, 2024). In that case, the court held that the Federal Rules did preempt Kentucky's UPEPA statute for two reasons unique to UPEPA: (1) "establishing a prima facie case is a higher burden than 'simply pleading claims adequately' as required by Rule 12(b)(6)," and (2) it forces

the responding party "to defend every motion filed as if it were a motion for summary judgment" and, thus, the reviewing court would be "'adjudicating those claims in a manner not contemplated or authorized by the Federal Rules.'" Id. at *6-7 (quoting Mucerino v. Martin, No. 3:21-CV-00284, 2021 WL 5585637, at *5 (M.D. Tenn. Nov. 30, 2021)). UPEPA's new procedure is markedly different from the prior anti-SLAPP law that the Godin court addressed, which did not contain the same procedural requirements that the court address evidence in support of the defamation claims "as a motion for summary judgment." Cf. 14 M.R.S. § 737 (2026); see also Nader v. Me. Democratic Party, 2012 ME 57, ¶ 17, 41 A.3d 551, abrogated by Gaudette v. Davis, 2017 ME 86, ¶ 17, 160 A.3d 1190 ("Application of this standard becomes problematic when the 'evidence' to be viewed most favorably to the moving party is disputed and consists only of pleadings and statements in affidavits not yet subject to discovery or trial.").[3]

It is precisely this core problem that the Peach v. Hagerman court identified as leading it to conclude that the Federal Rules preempted KUPEPA: Namely, that the UPEPA creates a totally different procedural track that does not exist in the Federal Rules, an early summary judgment procedure without the full Rule 56 discovery and process. Indeed, this is **consistent** with Godin, which specifically acknowledged that depending on the facts of the case, the procedures of the anti-SLAPP law can depart in material ways from the Federal Rules. 629 F.3d at 90. That is the case here. Moreover, it was the Godin court that also recognized this creates a potential Seventh Amendment or jury trial issue under Maine's constitution:

> There may be a concern that Section 556, to the extent it might be read to allow, contrary to Rule 56, a judge to resolve a disputed material issue of fact, would then preclude a party from exercising its Seventh Amendment rights to trial by jury on disputed issues of material fact. Cf. Pease v. Rathbun–Jones Eng'g Co., 243 U.S. 273 (1917) (summary judgment does

3 Recognizing this "problematic application," the Law Court then created a special "procedural component" whereby the court allows some discovery before holding an evidentiary hearing on the strength of the plaintiff's claims. Gaudette, 2017 ME 86, ¶ 18, 160 A.3d 1190.

> not violate Seventh Amendment). But Section 556 is a relatively young statute, not much construed by the state courts, and there is no reason to think the state courts would construe Section 556 so as to be incompatible with the Seventh Amendment. . . .

Id. at 90 n.18.

MSS further notes that its concern is not addressed, as the Court notes, by Thurlow v. Nelson, 2021 ME 58, ¶¶ 18-20, 263 A.3d 494 (ECF. No 29 at 5 n.4), because it is not the **weighing** of disputed evidence in determining a prima facie case, but the ability of MSS to have discovery and present its case to a factfinder in full. See also Paucek v. Shaulis, 349 F.R.D. 498, 513-14 (D.N.J., May 6, 2025) (holding that "[u]nquestionably, some provisions of UPEPA conflict with the Federal Rules," including requiring a plaintiff to produce enough evidence to raise an issue to the trier of fact "before trial is more than [what is] required under the Federal Rules"). As the District of New Jersey recently held, it is the *Defendant's* burden under Rule 12 to show that the claim must be dismissed, and it is also "the *defendant*'s burden to show under Rule 56 that there is no genuine dispute of material fact and that he is entitled to judgment as a matter of law." Id. at 512-13. "UPEPA's prima facie standard of dismissal conflicts with the Federal Rules by 'nullifying' a plaintiff's entitlement to trial if he can overcome a motion to dismiss or motion for summary judgment." Id. (quoting Abbas, 783 F.3d at 1334 (cleaned up) and Peach, 2024 WL 1748443, at *6 (W.D. Ky. Apr. 23, 2024)). Thus, "[b]y permitting a court to consider matters outside the pleadings, UPEPA would improperly force a plaintiff to defend every motion to dismiss as if it was a motion for summary judgment." Id. at 513 (citing Peach, 2024 WL 1748443, at *6). Thus, at least as to these aspects of Maine's UPEPA as applied in this case, there are irreconcilable conflicts with the Federal Rules that preclude the application of these procedural processes in federal court.

Moreover, as noted above, based on MSS's current information, it suspects that Rouleau went beyond publishing these to state agencies and instead published this false information to

parents and third parties, evidencing Rouleau's intent to harm his former employer, rather than engage in good-faith petitioning. Without the opportunity to depose Rouleau and conduct discovery (as a result of the automatic stay that UPEPA creates), MSS is in the unusual position of having to prove the merits of its case before having the opportunity to develop the evidentiary record, contemplated by Rule 56. This kind of procedural process and outcome would be especially confounding in the context of this case. Undisputedly the parties, going forward, will have **the exact same discovery** relating to Rouleau's allegations that he engaged in good-faith and protected whistleblowing activity. That the information learned in that discovery process would only be allowed to analyze Rouleau's whistleblower retaliation claims but not MSS's counterclaims would create a particular injustice and would not read UPEPA consistent with the state Constitution or Federal Rules.[4] Here, Rouleau filed this case in federal court, and both MSS and Rouleau should have their chance to be heard following the discovery process. As applied under the Federal Rules, Maine's UPEPA must be read consistently with the Federal Rules.

**2. MSS provides prima facie evidence of each element of its counterclaims.**

Even if this Court were to address whether MSS met its prima facie burden, which MSS maintains is not consistent with the Federal Rules, based on the four statements that Rouleau made, described above, MSS **has** met its burden.

**a. Standard of Proof**

---

4 Several courts have allowed discovery on other claims to go forward notwithstanding the automatic stay common in anti-SLAPP statutes. See, e.g., ProCare Hospice of Nevada, LLC v. OneCare Hospice, LLC, 340 F.R.D. 174, 177 (D. Nev. 2021) ("The purpose animating the anti-SLAPP law is not advanced by allowing a party to invoke the anti-SLAPP stay provision for protection (that is temporary in nature) from discovery regarding its own claims that it chose to litigate by initiating suit."); Columbia Sportswear N. Am., Inc. v. Seirus Innovated Accessories, Inc., No. 3:19-cv-137-SI, 2020 WL 403722, at *4 (D. Ore. Jan. 24, 2020) (declining stay of discovery as to federal claims because those claims "will go forward regardless of what happens to Plaintiff's state claims").

In reviewing a Special Motion to Dismiss under UPEPA, the analysis proceeds in three phases. First, the court must determine if UPEPA applies under Section 733(2), including, in relevant part, the communication was "on an issue under consideration or review in a legislative, executive, judicial, administrative or other governmental proceeding." 14 M.R.S. § 738 (2026). Relatedly, if the act applies, the court reviews whether any exceptions apply under Section 733(3), which include actions (1) against a governmental unit or employee in their official capacity; (2) against a governmental unit or official in enforcing a law to protect against an imminent threat to health or safety, and (3) against a person selling or leasing goods. Id. § 733(3)(A)-(C) (2026). Second, if the first two elements are met, then the responding party must "establish a prima facie case as to each element of the cause of action." Third, the court reviews legal viability. In that phase, the moving party has the opportunity to dismiss the case for failure "to state a cause of action on which relief can be granted," or that "there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law." Id. § 738(1)(C). By way of example to that last burden by the moving party, if the statements were opinion, and thus not defamatory as a matter of law, the moving party may be entitled to dismissal. See, e.g., Abbas v. Foreign Pol'y Group, 783 F.3d 1328, 1339 (D.C. Cir. 2015).

The four statements that MSS has identified, above, do relate to "issues under consideration or review" by the MDOE and DHHS in their triennial review of MSS. See Anderson v. Anderson, 36 N.W.3d 811 (Minn. Ct. App. 2026). However, this would not be the case if those very same statements were repeated to parents or other third parties, if MSS's suspicions are borne out in discovery. Moreover, none of the exceptions under Section 733(3) apply here because Rouleau is not a government actor, nor was he leasing or selling goods. Thus, Rouleau's Motion turns on whether MSS can establish prima facie evidence of every element of its two counterclaims.

In this analysis, as this Court has noted, it does not weigh the evidence, and the non-moving party "should be afforded 'a certain degree of leeway' in carrying its burden "due to 'the early stage at which the motion is brought and heard and the limited opportunity to conduct discovery.'" UPEPA § 7, cmt. 4 (Unif. L. Comm'n 2025) (quoting Integrated Healthcare Holdings, Inc. v. Fitzgibbons, 44 Cal. Rptr. 3d 517, 529 (2006)). "'A plaintiff's burden as to the second prong of the anti-SLAPP test is akin to that of a party **opposing** a motion for summary judgment." Id. (emphasis added) (quoting Yu v. Signet Bank/Virginia, 126 Cal. Rptr. 2d 516, 530 (Cal. Ct. App. 2002); (cleaned up)). "Accordingly, all a responding party must do . . . under Phase Two is produce evidence that, if believed, would satisfy each element . . . . A court may not weigh that evidence, but rather must take it as true and determine whether it meets the elements of the moved-upon cause of action." Id. (citing Sweetwater Union High Sch. Dist. v. Gilbane Bldg. Co., 434 P.3d 1152, 1157 (Cal. 2019)); see also Hallums v. Alston, No. CAAP-24-0000306, 2026 WL 1905523, at *6 (Haw. Ct. App. July 2, 2026).

**b. Defamation Counterclaim**

Under Maine law, a claim for defamation has four elements: (1) a false and defamatory statement; (2) unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the speaker; and (4) actionability meaning either: (a) defamation per se, or (b) some form of damages or harm. See Pan Am Sys., Inc. v. Hardenbergh, 871 F. Supp. 2d 6 (D. Me. 2012).

As to the first element, in order to be defamatory, the statement must be an assertion of fact, not merely an expression of an opinion. Lester v. Powers, 596 A.2d 65, 71 (Me. 1991). The standard for distinguishing fact from opinion looks to the totality of the circumstances: a comment is an opinion if it is clear from the surrounding circumstances that the maker did not intend to state an objective fact but intended rather to make a personal observation. Id. Further, the statement

must be false. Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc., 504 F.3d 189, 198 (1st Cir. 2007), as amended (Nov. 30, 2007) (applying Maine law). Whether a statement is "false" does not distinguish between minor inaccuracies" but instead concentrates on substantial truth. Veilleux v. Nat'l Broad. Co., 206 F.3d 92 (1st Cir. 2000).

MSS has easily met this burden with the four statements outlined above. Rouleau makes statements about his supervisors and MSS's treatment of children in its care that are baseless, false, and not opinion. He further purports to attribute statements to Taylor Williams and Jacob Bearce suggesting that they allowed and ignored students engaging in self-harm. (Williams Decl. ¶ 7; Bearce Decl. ¶¶ 9-10.) Rouleau also repeated false accusations that MSS was engaged in MaineCare fraud, well after he knew that such concerns had no merit. (Fitzgerald Decl. ¶¶ 8-15.) These are specific material assertions that would allow a jury to determine that Rouleau's statements were defamatory.

Second, MSS can establish Rouleau published these statements to a third party. "Publication" requires that the defamatory statement be communicated to at least one person other than the plaintiff F.D.I.C. v. S. Prawer & Co., 829 F. Supp. 439 (D. Me. 1993). However, publication need not go outside an organization; Maine courts have held that publication to a co-employee within the same organization satisfies this requirement. Id. Here, MSS clearly meets this element because it has provided e-mails which Rouleau enclosed in his Maine Human Rights Commission submission, making these false statements to Sarah Ferguson and Christina Ashe, and MSS suspects that there are others. (Exs. B, C to McGraw Decl.) Rouleau challenges MSS's counterclaims on the theory that republication of the Review and Safety CAP is not attributable to Rouleau, and was instead undertaken by DOE representatives. Pl's MTD (ECF No. 23) at 19. However, this argument misses the point. The "publication" element, as described above, included

Rouleau's publication to Sarah Ferguson at MDOE and Christina Ashe at DHHS directly, although there may be others with whom Rouleau directly published those false statements. MSS also included the transmittal of the Review and Safety CAP to show reasons why Rouleau's statements proximately led to a decline in enrollment.

Additionally, Rouleau's statements are unprivileged. Maine law recognizes two types of privileges. First, an "absolute privilege" exists for legislative debate or testimony in judicial proceedings. Lester, 596 A.2d 65, 69, n.6 (citing Vahlsing Christina Corp. v. Stanley, 487 A.2d 264, 267 (Me.1985)). Rouleau's statements fall outside the scope of absolute privilege. See generally Restatement (Second) of Torts §§ 635-642. The second type is a common law privilege that may arise in any situation in which the court recognizes that the person hearing the statement has "an important interest" that would be "'advanced by frank communication.'" Cole v. Chandler, 2000 ME 104, ¶ 6, 752 A.2d 1189 (quoting Rippett v. Bemis, 672 A.2d 82, 87 (Me.1996)). Examples include hospital peer reviews or tenure reviews. See Lester, 596 A.2d at 69 & n.6 (citing Onat v. Penobscot Bay Medical Center, 574 A.2d 872, 874 (Me.1990); Gautschi v. Maisel, 565 A.2d 1009, 1011 (Me.1989)). However, that privilege can be lost by abuse. Id. (citing Restatement (Second) of Torts § 599). "Such an abuse occurs when the person either knows the statement to be false or recklessly disregards its truth or falsity." Id. (citing Restatement (Second) of Torts § 600); Porietis v. Tradesmen Int'l, LLC, 227 F. Supp. 3d 126 (D. Me. 2017). Rouleau claims that his supervisors made statements to him about allowing students to self-harm in their presence, and secluding students without reporting as required under the law, while knowing that the supervisors made no such statements to him. (Williams Decl. ¶ 7; Bearce Decl. ¶¶ 8-9.) Similarly, Rouleau received the results of MSS's internal investigation on his concerns about MaineCare billing, but proceeded to repeat these accusations. Critically, as of the October 30 meeting with the Human

Resources Director, Katelynn Fitzgerald, Rouleau knew these assertions were baseless, yet he repeated them to at least one other individual, Christina Ashe, on November 20. (Fitzgerald Decl. ¶¶ 8-15; Compl. ¶ 138.) As a result, Rouleau cannot claim that any of his communications were privileged whatsoever.

In a futile attempt to sidestep this, in his Motion, Rouleau argues that his statements were protected by a statutory privilege in Maine law for mandatory reports of abuse and neglect. See, Rouleau's MTD (ECF No. 23) at 18-19; 22 M.R.S. § 4014 (2026). Rouleau's arguments are unavailing for three reasons. First, Rouleau cannot now misconstrue his October 26 e-mail to Sarah Ferguson as a "mandatory report" under Title 22 M.R.S. Section 4011-A. Rouleau followed **none of the procedures** set out for making a mandatory report. He did not report them to the Department for Health and Human Services,[5] he did not do so within twenty-four (24) hours of his reasonable suspicion of such circumstances, nor did he notify the district attorney or law enforcement, as required. 22 M.R.S. § 4011-A. Therefore, Rouleau's belated attempt to paint his e-mail to Sarah Ferguson at MDOE as a "mandatory report" should be given no weight. Further, in order to be immune from liability, as Rouleau claims, under the relevant law, the individual reporting must be "participating in good faith." 22 M.R.S. § 4014. As the statute explicitly notes, "Good faith does not include instances when a false report is made and the person knows the report is false." Id.

Third, in order to sustain a claim of defamation, the defendant must show that the defendant was at least negligent in publishing the defamatory statement. Levinsky's, Inc. v. Wal-Mart Stores, Inc., 127 F.3d 122 (1st Cir. 1997). Here, MSS and the supervisors about whom Rouleau was writing are not public figures,[6] nor is Rouleau a "media defendant" speaking about a matter of

---

[5] DHHS, not DOE, receives mandatory reports of suspected child abuse or neglect in Maine.

[6] "Plaintiffs are public figures if they either assume 'roles of especial prominence in the affairs of society,' perhaps by occupying positions of 'persuasive power and influence,' or 'thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.'" Pan Am Sys., Inc. v.

public concern. Galarneau, 504 F.3d at 199 (quoting Ramírez v. Rogers, 540 A.2d 475, 477 (Me.1988)). Although Rouleau argues in his Motion that his communications "reflect the exercise of the right[] . . . to petition 'on a matter of public concern,'" contrary to his contentions, that is not the standard to determine the level of fault required. While MSS expects that, at trial, it could prove that Rouleau acted at least with reckless disregard for the truth or knowledge of the falsity of his statements, MSS notes that the level of fault required in this case is ordinary negligence, not actual malice. Ballard v. Wagner, 2005 ME 86, ¶ 10, 877 A.2d 108. Based on the foregoing, MSS can clearly show Rouleau acted, at a minimum, negligently in publishing his defamatory statements.

Finally, the fourth element of a defamation claim under Maine law is actionability or harm. This can be shown in one of two ways: First, Maine law recognizes that some statements are actionable without regard to any showing of harm or loss as a result of the statement, so-called "defamation per se." Levinsky's, Inc., 127 F.3d at 135; Galarneau, 504 F.3d at 198. "Such words written falsely about a person's profession, occupation, or official station constitute [defamation] per se." Ballard, 2005 ME 86, ¶ 10, 877 A.2d 1083. Similarly, defamation per se may be found if the statements "impute the commission of a crime." F.D.I.C. v. S. Prawer & Co., 829 F. Supp. 439 (D. Me. 1993); Baker v. Charles, 919 F. Supp. 41 (D. Me. 1996).

Here, both aspects of defamation per se are implicated. First, Rouleau's four challenged statements would unarguably "adversely affect [the] fitness for the proper conduct of [MSS's] lawful business . . . whether honorary or for profit . . . ." Restatement (Second) of Torts, § 573; see also Thayer v. E. Maine Med. Ctr., 740 F. Supp. 2d 191, 199 (D. Me. 2010). Second, certain

Hardenbergh, 871 F. Supp. 2d 6, 14 (D. Me. 2012) (quoting Pendleton v. Haverhill, 156 F.3d 57, 67 (1st Cir. 1998) (cleaned up)).

statements by Rouleau could also implicate criminal liability under 17-A M.R.S. § 554(B-2), (C) (2026) (endangering the welfare of a child), among potential others, particularly with regard to Rouleau's false statements that his supervisor told him to "let [students] pass out" if they were choking themselves. However, as noted above, even if MSS were required to show some element of damages as the result of Rouleau's actions, it has done so by providing evidence of at least one prospective employee who refused an offer of employment citing news stories that repeated Rouleau's misinformation, as well as the refusal to enroll at least one MSS's student. (McGraw Decl. ¶¶ 15-16 and Ex. D.)

For these reasons, even if this Court reaches the question of prima facie evidence under the Federal Rules of Civil Procedure, MSS has established prima facie evidence of every element of defamation by Rouleau, and this Court should deny Rouleau's Motion to Dismiss its counterclaims on that basis.

**c. Tortious Interference Counterclaim**

In order to establish a claim for tortious interference with prospective economic advantage under Maine law, a Plaintiff must meet three elements: (1) a valid prospective economic advantage; (2) interference through fraud or intimidation; and (3) the interference proximately caused damages to the claimant. F.D.I.C. v. S. Prawer & Co., 829 F. Supp. 453 (D. Me. 1993).

First, Maine courts allow tortious interference claims to extend beyond mere interference with written contracts. Barker v. Int'l Paper Co., 993 F. Supp. 10 (D. Me. 1998). Rather, the Law Court has held that an action may be maintained for interference with future economic expectancy, even if it has not yet been reduced to a present contract. Id. The prospective economic advantage must be "reasonably probable" rather than "speculative." Meridian Med. Sys., LLC v. Epix Therapeutics, Inc., 2021 ME 24, ¶ 55 n.10, 250 A.3d 122 (citing Tensor Law P.C. v. Rubin, No.

2:18-cv-01490-SVW-SK, 2019 WL 3249595 at *12, (C.D. Cal. Apr. 10, 2019) ("A plaintiff asserting a claim of tortious interference with prospective economic advantage must establish that it is reasonably probable that the prospective economic advantage would have been realized but for defendant's interference.")) "To show an economic relationship, the cases generally agree that it must be reasonably probable the prospective economic advantage would have been realized but for defendant's interference." Id. (quoting Hayes v. N. Hills Gen. Hosp., 590 N.W.2d 243, 250 (S.D. 1999)). Here, MSS has met this element by showing (1) that an offeree declined a position citing Rouleau's claims, and (2) as well as the refusal to enroll at least one MSS's student relating to Rouleau's statements. (McGraw Decl. ¶ 16.)

Second, at this time, while MSS has not yet uncovered any facts that may suggest "intimidation" by Rouleau, in order to prove interference through "fraud" it must prove five things: the defendant: (1) made a false representation; (2) of a material fact; (3) with knowledge of its falsity or in reckless disregard of whether it is true or false; (4) for the purpose of inducing another to act or refrain from acting in reliance on it; and (5) the other person justifiably relied on the representation as true and acted upon it to the damage of the plaintiff.

The third element requires that the defendant's interference proximately caused actual damages to the plaintiff. A causal link between the wrongful interference and the harm is essential. In Tri-State Rubbish, Inc. v. Waste Mgmt., Inc., the court rejected a tortious interference claim where the plaintiff failed to point to any specific contract or customer with which the defendant's activities interfered, even accepting as true allegations of defamatory statements, because no causal link to any contract or customer had been established. 875 F. Supp. 8 (D. Me. 1994).

Here, as described above, MSS has shown prima facie evidence that its claims meet both elements: (1) false representations of material facts with at least reckless disregard for the truth;

and (2) MSS has alleged sufficient facts to show a pattern of egregious falsehoods by Rouleau, and it further expects that evidence will show that Rouleau made these statements with the intent to harm his supervisors and his employer. Finally, based upon the e-mails and representations of sending school administrative units, MSS has shown real evidence that Rouleau's false representations about MSS proximately caused harm to CMLC.

**Conclusion**

Plaintiff's Special Motion to Dismiss MSS's counterclaims under Maine's UPEPA and his Rule 12(b)(6) Motion to Dismiss must be denied because, like the Paucek court, this Court should decline to apply any aspect of Maine's UPEPA that conflicts with the Federal Rules of Civil Procedure, where UPEPA is "improperly forc[ing] a plaintiff to defend every motion to dismiss as if it were a motion for summary judgment." The Federal Rules have maintained an intentional distinction on motions to dismiss and summary judgment. Indeed, as the Paucek court held, as it applies to the prima facie and summary judgment standards, UPEPA's evidentiary burden-shifting procedures short-circuit exactly this protection by requiring plaintiff to show summary-judgment-type evidence at the motion-to-dismiss stage to survive a motion that, on its face, purports to test only the adequacy of its pleading and "weed out" meritless claims. UPEPA § 7, cmt. 4 (Unif. L. Comm'n 2025) (cleaned up).

However, even if this Court addresses the factual support that MSS proffers as prima facie evidence of its claims of defamation and tortious interference, MSS has plainly met those "minimum quantum" of evidence requirements. As such, this Court should deny Rouleau's Motion to Dismiss and reissue the standard Scheduling Order (ECF No. 10) previously issued on January 7, 2026.

Dated: September 17, 2026

*/s/ Tara A. Walker*
Tara A. Walker, Esq.

FISHER & PHILLIPS LLP
One Monument Square, Suite 201
Portland, ME 04101
(207) 477-7001

*Attorney for Maine School Solutions, LLC*