**UNITED STATES DISTRICT COURT**
**THE DISTRICT OF MAINE**

| | | |
|---|---|---|
| MAXWELL ROULEAU | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:25-cv-00566-LEW |
| MAINE SCHOOL SOLUTIONS, LLC and | ) | |
| BECKET ACADEMY, INC., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**<u>DECLARATION OF BRANNEN MCGRAW</u>**

I, BRANNEN MCGRAW, being over the age of eighteen (18) and competent in all respects to testify, hereby declare and affirm that the following is true and correct:

1. The facts set forth in this Declaration are based on my personal knowledge.

2. I have worked at MSS for 16 years. I have held several positions since joining MSS, but most recently I have served as Director of Educational Services. In that role, I oversee all of the educational programs at each of the three schools, indirectly supervise the personnel in each of our schools and directly supervise each of the school directors. In my role, I also direct long-term educational goals, program quality, and staff development, and ensure that MSS's schools comply with federal and state special education laws.

3. Maine School Solutions, LLC ("<u>MSS</u>") is a family of three (3) licensed special purpose private schools that serve students in grades K-12 in Belgrade, Monmouth, and Auburn, Maine.

4. MSS is approved by the Maine Department of Education to provide comprehensive, integrated services that address students' behavioral health and special education needs, most often through day treatment programs.

5. Students work directly with classroom teachers, behavioral health professional, clinicians, and various service providers to develop individualized treatment plans consistent with the student's individualized education program ("IEP") plan.

6. These providers offer coordinated services depending on a child's needs that include behavioral interventions, clinical therapy, educational instruction, medical care, and social support. Students are referred to MSS schools through the individualized educational program process with their local school districts.

7. Rouleau worked at Central Maine Learning Center ("CMLC") located in Belgrade. CMLC hired Rouleau on September 25, 2023, for a position as a behavioral health professional and educational technician.

8. CMLC is well known for its unique applied classes in its agricultural studies program in which students have the opportunity to participate in learning in the school's own farm and greenhouse, raising and caring for animals on the farm, and the building trades program. The building trades program also features a state-of-the-art wood shop, and for those students who are able, students participate in daily physical education and art programs. Students also have the opportunity to participate in weekly off-campus field trips and interact with guest speakers. CMLC currently serves students from over sixteen (16) school districts.

9. In my role as Executive Director, I have also been charged with updating some of the schools' policies to comply with applicable law, including our Restraint and Seclusion Policy. A copy of that policy is attached as **Exhibit A.**

10. I have reviewed the email that Mr. Rouleau sent to Maine Department of Education employee Sarah Ferguson on October 26, 2024, attached hereto as **Exhibit B**, and which I received as part of Mr. Rouleau's submission to the Maine Human Rights Commission. This email was also attached as Exhibit B to his Complaint of Discrimination.

11. In one portion of the e-mail attached here as **Exhibit B**, Mr. Rouleau states: "In regards to the students that were placed in the '1:1' room in the Life Skills section of the building there have been two students that have been in there **for 2-3 months** and two students that have been placed in there **for a day** since I have been employed at CMLC (09/25/2023)."

12. Mr. Rouleau goes on to write, "The first student was placed there at the end of January due to their frequent property destruction and classroom disruptions (is my understanding). This is the student that we discussed over the phone, where I brought up concerns about the work being given to them and their personal academic level at that time . . . ." (See **Exhibit B**.)

13. Mr. Rouleau's statements about these students imply that MSS determined the student's placement within the school. That is not accurate. A student's IEP team, typically comprised of the sending school district, relevant treating providers and experts, MSS representatives, and parents or guardians, determines the student's educational setting, including whether they can be safely educated alongside other students, or if they need individualized programming outside the presence of other students, and those decisions are often made by consensus.

14. Students educated in this setting are educated in classrooms, not quiet rooms (or in isolation or seclusion), and these plans include daily outdoor activities, time in the

gymnasium, time in art class, among others. Many of these students seek these settings at their own request, which clinicians take part in reviewing and determining.

15. I have also received a copy of an e-mail that Mr. Rouleau appears to have sent to the Maine Department of Education, which they provided to MSS in response to a subpoena. In that e-mail, dated October 31, 2026, Mr. Rouleau states: "They have told us that we are mandated reporters but told us that our duty was only to report suspicions to the student's clinician and explicitly told us not to call DHHS or CPS as we 'don't know the situation as well as the clinicians and CPS might already be involved.' There have been several things that I have taken to clinicians personally and I am unsure If calls were made." **Exhibit C.**

16. I understand that Rouleau also made several false statements about his supervisors instructing him to ignore children that were harming themselves, as well as falsely claiming that MSS had not been billing properly under MaineCare. After Rouleau made these false statements to MDOE representatives, the "staff reports" were included in their Safety CAP and letter of finding. These staff reports were then sent to all sixteen sending school districts for CMLC.

17. These emails were attached to Mr. Rouleau's Maine Human Rights Commission submissions, and at this time, we do not have information about other conversations or statements that he may have had with other individuals.

18. I strongly suspect that Mr. Rouleau had other conversations with students' parents and other third parties because they have made legal claims and assertions that remarkably resemble Mr. Rouleau's false statements, including in part *Bobbi Jo Simard v. Maine School Solutions, LLC*, et al., Kennebec County Superior Court, Docket No. AUGSC-CV-25-130.

19. Although I understand Mr. Rouleau's statements and assertions relate to MSS's business, operation, and profession, which do not require proof of harm, even if it did not relate to our business, there have been actual effects.

20. At least one candidate for employment has withdrawn from consideration after being given an offer, citing Rouleau's false claims as the reason for such withdrawal. See **Exhibit C**. Relatedly, the IEP team for at least one student that I am aware of, has rejected a possible placement at CMLC citing some of the false information that Rouleau provided to DOE and/or what we suspect he provided to families.

21. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 09/17/2026____

/s/ Brannen McGraw_____________
Brannen McGraw
Executive Director